UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

RG Golf Warehouse, Inc.,

                Plaintiff,

      v.

The Golf Warehouse, LLC,

                Defendant.

Case No. 19-cv-0585 (WMW/DTS)

**ORDER**

---

This breach-of-contract matter is before the Court on cross motions for summary judgment and Defendant's motion to exclude expert testimony. (Dkts. 102, 107). For the reasons addressed below, Defendant's motions are granted and Plaintiff's motion is granted in part and denied in part.

## BACKGROUND

Plaintiff RG Golf Warehouse, Inc. (RG), is a Florida corporation that operates the website "golfwarehouse.com." Defendant The Golf Warehouse, LLC (TGW), is a retailer based in Kansas that sells golf merchandise through multiple websites, including "tgw.com."

In January and February 2011, RG and TGW negotiated the terms of an affiliate arrangement whereby RG would refer online customers from its website to TGW's websites in exchange for referral fees and commissions. As a result of these negotiations, RG and TGW executed a letter of intent (LOI) dated February 21, 2011. The LOI "sets forth certain substantive terms and the basis of the proposed transaction . . . for the

ownership and operation of one or more websites to be owned by TGW." The LOI also provides that it "will constitute an agreement in principle (and not a binding contract except as provided in Section 5 [of the LOI])." The LOI describes "Proposed Transaction terms" that include varying commission tiers and methods for tracking RG's referred website traffic.

The parties subsequently executed a referral agreement (Agreement) on March 10, 2011. By its terms, the Agreement was effective for a five-year period beginning on March 10, 2011, subject to automatic renewal every year thereafter. But either party could terminate the Agreement "without cause and for convenience" with 30 days' written notice. The Agreement also contains a merger clause providing that the Agreement "supersedes all prior agreements, arrangements and understandings, written or oral, relating to the subject matter contained in this Agreement."

In the Agreement, RG agreed to refer to TGW's websites the customers from RG's sales channels—namely, RG's website, a dedicated telephone line, and an email inbox. In exchange, TGW agreed to pay RG commissions for orders placed by customers who purchased merchandise from TGW after being referred by RG:

> Section 1. **Referral Services.** RG Golf, Inc. shall use the RG Golf, Inc. Sales Channels to direct customers exclusively to TGW's Websites. TGW shall pay RG Golf, Inc. for customer orders placed through the RG Golf Inc. Sales Channels as set forth below.

The Agreement provides that RG's commission would correspond to a percentage of the "Net Sale" amount of each order, as follows:

> (a) If the order is not subject to Promotional Discounts, TGW shall pay RG Golf, Inc.:
>> (i) For New Customers – 14% of Net Sales;
>> (ii) For Return Customers – 11% of Net Sales; and
>> (iii) For existing TGW Customers – 5.5% of Net Sales.
> (b) If the order is subject to Promotional Discounts, TGW shall pay RG Golf, Inc. 5.5% of Net Sales.

Unlike the LOI, the Agreement does not specifically describe methods for tracking RG's referred website traffic. But the Agreement provides that "TGW will use its reasonable best efforts to have a customer self-identify as a New Customer or Return Customer based on the customer selecting its previous profile information" and that "TGW shall provide a periodic report of such numbers to RG Golf, Inc. every month, or as otherwise mutually agreed to." The Agreement also provides that "TGW's calculations with respect to customer status are final and binding."

After the parties' referral relationship began, TGW sent monthly reports to RG listing commissionable orders and the associated commission amounts and issued checks to RG for the corresponding amounts. In the months and years that followed, several disagreements arose as to the tracking and calculation of commission payments under the Agreement. These disagreements involved three primary disputes.

First, RG alleged that TGW had incorrectly tracked "repeat orders" placed directly on TGW's website (but not through RG "Sales Channels") by customers that previously had placed orders through RG "Sales Channels." TGW initially agreed with RG that it should be paying RG commissions for such orders and adjusted its commission payments accordingly. Subsequently, however, TGW concluded that the Agreement did *not* require

TGW to pay commissions for orders that were not placed through RG "Sales Channels." Consequently, in March 2014, TGW notified RG that TGW had *overpaid* commissions.

Second, TGW notified RG in September 2011 that TGW had conducted an investigation and determined that it had not been tracking phone sales correctly. At that time, TGW represented to RG that it would remedy this error, explaining that the error "[s]eems like an oversight" that TGW would "fix," and that "the report is being modified, and [TGW will] generate a back report to see what [RG is] owed and will pay [RG], of course."

Third, in January 2013, RG notified TGW that the two-week "cookie" tracking of website traffic had been shut off, and RG represented to TGW that the Agreement required such tracking. In response, TGW acknowledged that it had failed to use cookie tracking from July 1, 2012, through January 24, 2013, and agreed to pay RG additional commissions from that period. Subsequently, however, TGW concluded that the Agreement did *not* require TGW to use "cookies" to track customer orders.

On December 10, 2014, TGW terminated the Agreement after providing 30 days' written notice to RG. In March 2019, RG commenced this breach-of-contract action against TGW, alleging that TGW breached the Agreement by, among other actions, failing to pay amounts due under the Agreement.[1] In July 2020, TGW amended its

---

[1] In its complaint, RG also asserts claims for breach of the implied covenant of good faith and fair dealing, tortious interference with contract and fraud. These claims were dismissed in 2019, and only RG's breach-of-contract claim remains.

answer to assert two counterclaims against RG, alleging breach of contract and unjust enrichment based on RG's retention of allegedly overpaid commissions.

The parties now cross-move for summary judgment. RG moves for summary judgment as to its breach-of-contract claim and TGW's two counterclaims. TGW moves for summary judgment as to RG's breach-of-contract claim and moves to exclude the opinions and testimony of RG's damages expert.

## ANALYSIS

### I.    TGW's Motion to Exclude Expert Testimony

As a threshold matter, TGW moves to exclude the opinions and testimony of RG's damages expert, Fernando Torres. RG retained Torres to opine about RG's damages attributable to TGW's alleged breach of the parties' Agreement.

The admissibility of expert testimony is an issue of law for the district court to decide and is governed by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and

>    (d) the expert has reliably applied the principles and methods
>        to the facts of the case.

Fed. R. Evid. 702. "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." Fed. R. Evid. 703. "If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." *Id.*

The proponent of expert testimony must prove its admissibility by a preponderance of the evidence. *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001). "Rule 702 reflects an attempt to liberalize the rules governing the admission of expert testimony" and favors admissibility over exclusion. *Id.* (internal quotation marks omitted). Determinations as to the admissibility of expert testimony are within a district court's discretion. *See Arkwright Mut. Ins. Co. v. Gwinner Oil, Inc.*, 125 F.3d 1176, 1182 (8th Cir. 1997).

A district court must ensure that testimony admitted under Rule 702 "is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. When making this reliability determination, a court may evaluate whether the expert's method has been tested or subjected to peer review and publication, the method's known or potential rate of error, and the method's general acceptance. *Presley v. Lakewood Eng'g & Mfg. Co.*, 553 F.3d 638, 643 (8th Cir. 2009) (citing *Daubert*, 509 U.S. at 593–94). These factors are not exhaustive, and a court must evaluate the reliability of expert testimony based on the facts of the case. *Id.* A court also may consider "whether the expertise was developed for litigation or naturally flowed from the expert's research; whether the proposed expert

ruled out other alternative explanations; and whether the proposed expert sufficiently connected the proposed testimony with the facts of the case." *Sappington v. Skyjack, Inc.*, 512 F.3d 440, 449 (8th Cir. 2008) (internal quotation marks omitted).  When weighing these factors, a district court must function as a gatekeeper to separate "expert opinion evidence based on 'good grounds' from subjective speculation that masquerades as scientific knowledge." *Glastetter v. Novartis Pharm. Corp.*, 252 F.3d 986, 989 (8th Cir. 2001).

Expert testimony is not admissible if it is "speculative, unsupported by sufficient facts, or contrary to the facts of the case," *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757 (8th Cir. 2006), such that it is "so fundamentally unsupported that it can offer no assistance to the jury," *Minn. Supply Co. v. Raymond Corp.*, 472 F.3d 524, 544 (8th Cir. 2006) (internal quotation marks omitted).  Disputes about the factual basis of an expert's testimony ordinarily implicate the credibility—not the admissibility—of the testimony. *See Sappington*, 512 F.3d at 450; *Minn. Supply Co.*, 472 F.3d at 544.  Expert testimony may be excluded, however, when "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

TGW does not dispute Torres's qualifications.  Instead, TGW argues that Torres's opinions are unreliable because they have insufficient factual basis, are contradicted by the record and are based on anecdotal and speculative information.  In particular, TGW challenges a basic premise that underlies all of Torres's opinions about the unpaid commissions that TGW allegedly owes to RG—namely, that the annual average number

of expected "repeat orders" is between 2.3 and 2.5 repeat orders per customer annually. Torres opines that his "calculation of the reasonably expected repeat orders reflects the relevant industry's general experience of an average of between 2 and 3 repeat purchases made by customers each year." Torres applies this "repeat business parameter" to the "accumulated pool of New RG customers every month" to calculate the underpaid commissions that TGW allegedly owes to RG. According to TGW, Torres's "repeat business parameter" is unreliable because it is based on anecdotal evidence and speculation.

When an expert opinion is based on "speculative calculations" or "incorrect factual premises" that contradict the record, exclusion of the expert opinion is warranted. *Cole v. Homier Distrib. Co.*, 599 F.3d 856, 865 (8th Cir. 2010). And a damages expert's opinions may be unreliable if the expert relies on unverified assumptions and estimates provided by the party seeking damages. *See, e.g.*, *U.S. Salt, Inc. v. Broken Arrow, Inc.*, 563 F.3d 687, 689, 691 (8th Cir. 2009) (affirming exclusion of plaintiff's damages expert who "relied almost exclusively—and without verification—on [the plaintiff's] unsupported assumptions and estimates" and "optimistic projections" about sales without conducting any independent analysis to confirm those assumptions and projections).

According to Torres's expert report, "[p]er [RG] management, the [repeat customer] expectation is 2.5 times, [and] per deposition testimony of industry expert Samuel Maki, the experience at Golfsmith was 2.3 times . . . . Both parameter estimates are used in the analysis to estimate reasonable repeat orders." In other words, Torres's

"repeat business parameter" is based entirely on two data sources: first, the expectations of RG's management in support of an estimated repeat-business rate of 2.5 times per customer annually, and second, the deposition testimony of "industry expert" Maki in support of an estimated repeat-business rate of 2.3 times per customer annually.   The Court evaluates these two data sources in turn.

Torres's report first relies on the "expectation" of RG's management that the annual average rate of repeat orders from a customer is 2.5 times per customer annually. During his deposition, Torres testified that this number is "the expectation of [RG], and it's not an actual number reported to [RG]."   When asked whether he independently evaluated this expectation, Torres responded: "No.  That was not part of my task."  As such, Torres accepted at face value RG's management's estimated sales expectations. During the deposition of RG's corporate designee Gregory Anda on the issue of damages, Anda confirmed that he had assumed a repeat-business rate of 2.5 times per customer annually "for the life of the contract" with TGW.  When asked what information Anda relied on to calculate an expected repeat-business rate of 2.5 times per customer annually, Anda testified that this number was "told" to him by others.[2]   A damages expert's reliance on unverified assumptions and projections from the plaintiff about expected sales is insufficient to demonstrate admissibility.  *See U.S. Salt, Inc.*, 563 F.3d at 689, 691 (affirming district court's exclusion of expert testimony because damages expert "relied

---

[2]      Notably, one of the other individuals who Anda identified as the source of this information was Samuel Maki, the other witness whose testimony Torres relied on. Torres cannot reasonably corroborate Maki's estimate with Anda's estimate if both estimates originate from Maki.

almost exclusively on [the plaintiff's] speculative estimates without any independent verification").   There is no nonspeculative evidence in the record to support the "2.5 times" repeat-business rate on which Torres relied, which appears to be a self-serving assumption made by RG's management.

Torres's report also relies on the experience of "industry expert" Maki to support Torres's estimated repeat business rate of 2.3 times.  Maki's prior employment in the golf industry involved marketing and e-commerce roles for a company called Golfsmith from 2003 through 2015.  Maki testified that, at Golfsmith, the average annual repeat business from a customer was "2.3 times . . . for people who signed up for [Golfsmith's] e-mail program."  When asked what the "online golf industry average repeat customer [rate] would be," Maki responded: "I don't have an answer for that."  Contrary to Maki's testimony, Torres opines that his "calculation of the reasonably expected repeat orders reflects the relevant industry's general experience," based on the "deposition testimony of industry expert Samuel Maki."  And at his deposition, Torres testified that "2.3, I think, is the average number that was testified to in deposition by an industry expert."  But Maki did not testify as to an industry average.  Instead, he disclaimed having any knowledge about repeat-customer rates for the golf industry generally.  Maki testified only that a repeat-business rate of 2.3 times per customer annually reflected his experience with a *subset* of *Golfsmith's* customers—namely, customers who signed up for Golfsmith's e-mail loyalty program.  The record does not demonstrate that Golfsmith's business is comparable to RG's or TGW's business, let alone that Golfsmith's loyalty program

customers are comparable to RG's or TGW's customers or reflective of the golf industry generally.[3]

In summary, Torres's damages calculations are based on a fundamental assumption that the annual average number of expected "repeat orders" from RG's customers is between 2.3 and 2.5 per customer annually. But these assumptions are based on either RG's self-serving and speculative sales projections or testimony pertaining to a subset of an unrelated company's customers. Torres's opinions are unreliable because they are based on "speculative calculations" or "incorrect factual premises" that the record contradicts. *Cole*, 599 F.3d at 865. Exclusion of Torres's unreliable opinions is warranted on this record because there is "too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co.*, 522 U.S. at 146.

For these reasons, the Court grants TGW's motion to exclude the opinions and testimony of Torres.

## II.   Cross-Motions for Summary Judgment

Summary judgment is proper when the record before the district court establishes that there is "no genuine dispute as to any material fact" and the moving party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to a material fact exists when "the evidence is such that a reasonable jury could return a verdict for the

---

[3]   Indeed, when asked whether Golfsmith and TGW are comparable companies, Maki testified that both companies "serviced a lot of the same customers, *but they operated very differently*." (Emphasis added.) And although Torres described Golfsmith as "comparable" to TGW during his deposition, Torres testified that he did no independent research to confirm whether Golfsmith and TGW are comparable.

nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When deciding a motion for summary judgment, a district court construes the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in the nonmoving party's favor.  *See Windstream Corp. v. Da Gragnano*, 757 F.3d 798, 802–03 (8th Cir. 2014).  When asserting that a fact is genuinely disputed, the nonmoving party must "submit affidavits, depositions, answers to interrogatories, or admissions on file and designate specific facts" in support of the asserted factual dispute.  *Gander Mountain Co. v. Cabela's, Inc.*, 540 F.3d 827, 831–32 (8th Cir. 2008); *see also* Fed. R. Civ. P. 56(c)(1)(A).  A nonmoving party may not "rest on mere allegations or denials but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995) (internal quotation marks omitted).

Here, the parties cross-move for summary judgment as to RG's breach-of-contract claim.  In addition, RG moves for summary judgment as to TGW's breach-of-contract and unjust-enrichment counterclaims.  The Court addresses each claim and counterclaim in turn.

### A.    RG's Breach-of-Contract Claim

The parties cross-move for summary judgment as to RG's breach-of-contract claim.  It is undisputed that the parties' Agreement is governed by Indiana law pursuant to a choice-of-law provision in the Agreement.

Under Indiana law, the essential elements of a breach-of-contract claim are the existence of a contract, the defendant's breach of the contract and damages. *Rogier v. Am. Testing & Eng'g Corp.*, 734 N.E.2d 606, 614 (Ind. Ct. App. 2000). "The construction of the terms of a written contract is a pure question of law," and a district court may grant summary judgment based on the construction of a written contract if the court concludes either "(1) the contract is not ambiguous or uncertain as a matter of law and the trial court need only apply the terms of the contract or (2) the contract is ambiguous, but the ambiguity may be resolved without the aid of factual determinations." *City of New Albany v. Cotner*, 919 N.E.2d 125, 131 (Ind. Ct. App. 2009).

Here, the parties agree that a valid contract existed—namely, the parties' Agreement. But the parties dispute whether there is record evidence that TGW breached the Agreement and whether RG suffered damages as a result of a breach.

### 1.    Breach

RG asserts that TGW breached the Agreement in two ways—first, by failing to adequately track and report customer orders as required by the Agreement, and second, by failing to pay commissions to RG as required by the Agreement.

### a.    Tracking and Reporting

The parties first dispute whether TGW breached the Agreement by failing to track and report customer orders adequately.

The Agreement provides that "TGW will use its reasonable best efforts to have a customer self-identify as a New Customer or Return Customer based on the customer

selecting its previous profile information."   The Agreement also requires TGW to "provide a periodic report of such numbers to RG Golf, Inc. every month, or as otherwise mutually agreed to; *provided, however*, that TGW's calculations with respect to customer status are final and binding."   The Agreement does not otherwise address the manner in which TGW must track or report customer orders.

RG contends that TGW failed to adequately track and report customer orders in four ways: (1) improperly tracking and reporting repeat customers, (2) improperly tracking and reporting phone sales, (3) failing to track website traffic using "cookie" tracking tools, and (4) generally failing to use its best efforts to identify customers.

### i.     Tracking and Reporting Repeat Customers

RG first contends that TGW failed to properly track and report "repeat customers."   TGW concedes that it misreported "repeat customers" for a period of time but contends that it did so mistakenly and to RG's benefit by *overcounting* repeat customers rather than undercounting repeat customers.

The record undisputedly reflects that, while the Agreement was in effect, RG and TGW expressed confusion and disagreement about who should be considered a "repeat customer"—namely, whether TGW owed commissions to RG for customers who placed orders directly on TGW's website.   TGW initially agreed with RG that TGW should be paying RG commissions for such orders, and TGW adjusted its commission payments accordingly.   Subsequently, however, TGW concluded that Agreement did *not* require

TGW to pay commissions for orders that were not placed through RG's "Sales Channels."

The unambiguous terms of the Agreement resolve this confusion, however. The plain language of the Agreement establishes that TGW was required to pay commissions to RG only "for customer orders placed through [RG's] Sales Channels." And the Agreement defines RG's "Sales Channels" as RG's website, phone line, and email. The Agreement does not use the phrase "repeat customer," but the Agreement defines "Return Customer" as a customer who "uses the RG Golf, Inc. Sales Channels to place an order." Customer orders placed directly on TGW's website are not "orders placed through" RG's website, phone line, or email. Thus, customer orders placed directly on TGW's website do not constitute orders made by a customer who "uses the RG Golf, Inc. Sales Channels to place an order." The Agreement, therefore, did not require TGW to track or pay commissions for such orders.

According to RG, if a customer placed an initial order through one of RG's "Sales Channels," any subsequent orders from that customer entitled RG to a commission payment, even if those subsequent orders were not placed through one of RG's "Sales Channels." RG contends that such customers are "lifetime customers" for whom RG is entitled to commissions. But the language of the Agreement, which makes no reference to "lifetime customers" either expressly or implicitly, lends no support to RG's contention. And RG's interpretation is inconsistent with the plain language of the Agreement, under which TGW was required to pay commissions "for customer orders"

based on how those orders are "placed."  The Agreement plainly tethers commissions to each individual order, not each individual customer.  RG's interpretation also is inconsistent with the Agreement's definition of a "Return Customer" as a customer who "uses the RG Golf, Inc. Sales Channels to place an order."[4]  If a customer places an order directly on TGW's website, that customer has not used RG's "Sales Channels" to place that order and, therefore, is not a "Return Customer" as defined by the Agreement.

RG attempts to avoid this result by arguing that Section 1 of the Agreement either is ambiguous or was implicitly modified by the parties' course of conduct.  Neither argument is legally sound.

First, although RG vaguely asserts that Section 1 of the Agreement is ambiguous, RG does not identify any evidence of ambiguity other than the parties' disagreement and prior confusion.  "A contract will be found to be ambiguous only if reasonable persons would differ as to the meaning of its terms," and "[a] contract is not ambiguous merely because the parties disagree as to its proper construction."  *Stewart v. TT Com. One, LLC*, 911 N.E.2d 51, 56 (Ind. Ct. App. 2009).  As the foregoing analysis demonstrates, the Agreement limits commissions to orders placed through RG's "Sales Channels," and defines a "Return Customer" as a customer who uses RG's "Sales Channels" to place an order.  RG's contrary interpretation has no basis in the Agreement's terms or structure, is

---

[4]   Notably, the Agreement's definition of "Return Customer" employs the present-tense word "uses," which reflects that a "Return Customer" is defined based on how the customer places his or her present order, not based on how the customer placed previous orders.  This language is consistent with the conclusion that the Agreement clearly ties commissions to orders rather than customers.

inconsistent with the plain language of the Agreement, and is not reasonable.  As such, RG has not demonstrated that Section 1 of the Agreement is ambiguous as to repeat customers.[5]

Second, RG erroneously contends that the Agreement was modified by the parties' course of conduct, including TGW's initial agreement with RG about the interpretation of who should be considered a "repeat costumer" under the Agreement.  Indiana law provides that "a contract modification may be implied from the conduct of the parties" and "need not be in writing."[6]  *Lake Ridge New Tech Schs. v. Bank of N.Y. Mellon*, 353 F. Supp. 3d 745, 752 (N.D. Ind. 2018).  But a "contract modification requires an offer, acceptance, and consideration to be enforceable."  *Id.*  Any evidence that the parties misunderstood and disputed the scope of the Agreement at various times throughout their contractual relationship does not demonstrate an implicit offer, acceptance or consideration to support a modification.  Indeed, "consideration requires a bargained-for exchange" resulting in "either a benefit to the promisor or a detriment to the promisee."

---

[5]     Absent an ambiguity, it is improper for a court to consider extrinsic evidence.  *See Orme v. Estate of Kruwell*, 453 N.E.2d 355, 356 (Ind. Ct. App. 1983) ("Parol or extrinsic evidence is inadmissible to expand, vary, or explain the instrument unless there has been a showing of fraud, mistake, ambiguity, illegality, duress, or undue influence."); *see also Jackson v. DeFabis*, 553 N.E.2d 1212, 1215 (Ind. Ct. App. 1990) ("Where the terms of a contract are clear and unambiguous, the terms are conclusive and we will not construe the contract or look at extrinsic evidence, but will merely apply the contractual provisions."). As such, RG's arguments that rely on extrinsic evidence are irrelevant.

[6]     Although the Agreement provides that all modifications must be in writing, the Indiana Supreme Court has recognized that a contract providing that any modification must be in writing "nevertheless may be modified orally."  *AM Gen. LLC v. Armour*, 46 N.E.3d 436, 443 n.3 (Ind. 2015).

*AM Gen. LLC v. Armour*, 46 N.E.3d 436, 443 (Ind. 2015).   Nothing in the record demonstrates that TGW obtained a benefit by agreeing to pay RG more than TGW was obligated to pay under the terms of the Agreement.   Moreover, a contract modification that cannot be completed within one year falls within the Statute of Frauds and, therefore, must be in writing.   *Zusy v. Int'l Med. Grp., Inc.*, 500 F. Supp. 2d 1087, 1096 (S.D. Ind. 2007) (applying Indiana law).   Here, the parties' Agreement had a five-year term that was subject to the writing requirement of the Statute of Frauds.   Accordingly, RG has not demonstrated that the parties implicitly modified Section 1 of the Agreement through their course of conduct.

For all of the foregoing reasons, the Court rejects RG's contention that TGW breached the Agreement by failing to properly track and report "repeat customers."

### ii.    Tracking and Reporting Phone Sales

RG next contends that TGW failed to properly track and report phone sales as required by the Agreement.

Although orders made through RG's "Sales Channels" include phone sales, the Agreement does not expressly address *how* TGW should track phone sales.   As such, RG has not identified a precise tracking requirement that TGW failed to perform and instead contends that TGW generally failed to track and report phone sales correctly.   But RG has identified minimal evidence pertaining to TGW's alleged improper tracking and reporting of phone sales.   The record evidence pertaining to phone sales reflects that TGW investigated this issue in or about September 2011 and determined that TGW had

not been tracking phone sales correctly.  At that time, TGW conceded its mistake and represented to RG that it would remedy the error, explaining that the error "[s]eems like an oversight" that TGW would "fix," and that "the report is being modified, and [TGW will] generate a back report to see what [RG is] owed and will pay [RG], of course."  RG identifies no evidence about what occurred thereafter regarding the tracking or reporting of phone sales.  Significantly, RG identifies no evidence suggesting that TGW failed to correct its oversight or that TGW improperly tracked phone sales thereafter.  On this record, RG cannot establish a breach of the Agreement based on the alleged improper tracking and reporting of phone sales.

Accordingly, the Court rejects RG's contention that TGW breached the Agreement by failing to properly track and report phone sales.

### iii.    Two-Week "Cookie" Tracking

RG next contends that TGW breached the Agreement by failing to use two-week "cookie" tracking from July 1, 2012, through January 24, 2013, to track website traffic.

It is undisputed that TGW did not use two-week "cookie" tracking for a period of approximately six months while the Agreement was in effect.  But it is similarly undisputed that the Agreement does not require such tracking.  Indeed, the Agreement does not even reference "cookies."  Although the parties' LOI references "cookie" tracking, the LOI expressly provides that it is non-binding, and the subsequently executed Agreement contains a merger clause reflecting that the Agreement "supersedes all prior agreements, arrangements and understandings, written or oral, relating to the subject

matter contained in this Agreement."  Because the Agreement does not require "cookie" tracking, TGW cannot breach the Agreement by failing to do something that the Agreement does not require.

RG attempts to avoid this result by suggesting that the Agreement's failure to mention "cookie" tracking renders the Agreement ambiguous and that this ambiguity may be resolved based on evidence extrinsic to the Agreement.  But a written contract's silence as to a particular issue does not render the contract ambiguous.  *See, e.g.*, *Ind. Glass Co. v. Ind. Mich. Power Co.*, 692 N.E.2d 886, 887 n.1 (Ind. Ct. App. 1998) (observing that a contract's "silence" as to a purported contractual obligation does not demonstrate ambiguity but instead is "the simplest way to draft a contract to indicate that no such [obligation is] contemplated by the parties"); *accord Haag v. Castro*, 959 N.E.2d 819, 821 (Ind. 2012); *George Uzelac & Assocs. v. Guzik*, 663 N.E.2d 238, 240–41 (Ind. Ct. App. 1996).   Here, the Agreement's silence as to "cookie" tracking does not demonstrate ambiguity.  Rather, the Agreement's silence unambiguously demonstrates that the parties did not contemplate, and the Agreement does not require, "cookie" tracking.

RG also contends that the Agreement was modified by the parties' course of conduct such that TGW was required to use two-week "cookie" tracking.  But for the same reasons addressed above in Part II.A.1.a.i. of this Order, this argument lacks merit. The record does not reflect the prerequisites to support such a modification—namely, the existence of an offer, acceptance and consideration.  Most significantly, there is no

evidence that TGW obtained a benefit in exchange for assuming an additional obligation that is not required by the Agreement.  Moreover, any such modification would require a written instrument under the Statute of Frauds.  For these reasons, RG has not demonstrated that the parties implicitly modified the Agreement through their course of conduct.

Accordingly, the Court rejects RG's contention that TGW breached the Agreement by failing to use two-week "cookie" tracking from July 1, 2012, through January 24, 2013, to track website traffic.

### iv.    Use of Best Efforts to Identify Customers

RG also contends that TGW breached the Agreement by failing to use its reasonable best efforts to identify customers.

Some courts applying Indiana law have concluded that a contract's "best efforts" clause may be too indefinite to be enforceable.  *See, e.g.*, *Wright-Moore Corp. v. Ricoh Corp.*, 794 F. Supp. 844, 867 (N.D. Ind. 1991) (concluding that a contract's " 'best efforts' provision is too indefinite to be enforced under Indiana law" because it would be "impossible for a court to determine the meaning of the 'best efforts' clause").  The Indiana Supreme Court does not appear to have addressed this precise issue.  However, the United States Court of Appeals for the Seventh Circuit "believe[s] that Indiana's highest court would take the approach that 'best efforts' provisions can be contractually enforced" if the provision is not overly vague.  *Hinc v. Lime-O-Sol Co.*, 382 F.3d 716, 721 (7th Cir. 2004).  " 'Best efforts,' as commonly understood, means, at the very least,

*some* effort.  It certainly does not mean *zero* effort" such that a contracting party may "escape any obligation under its contract."  *Id.*  A requirement to use "best efforts" also may mean "an obligation to act with good faith in light of one's own capabilities." *Bartsh v. Nw. Airlines, Inc.*, 831 F.2d 1297, 1304 (7th Cir. 1987) (internal quotation marks omitted) (recognizing that a requirement to use best efforts "indicates a degree of discretion rather than an absolute requirement" (citing *W. Geophysical Co. v. Bolt Assocs.*, 584 F.2d 1164, 1171 (2d Cir. 1978)).  "A 'best efforts' requirement necessarily presupposes that, in some cases, even the 'best efforts' will fail to achieve the ultimate goal." *Id.*

Here, the Agreement required TGW to "use its reasonable best efforts to have a customer self-identify as a New Customer or Return Customer."  Notably, the Agreement does *not* require TGW to use "best efforts" to track or report all customers.  Instead, the Agreement's "best efforts" clause is limited to the self-identification of customers, and the Agreement does not elaborate as to how this should be accomplished.  In this context, the "best efforts" clause in the Agreement may be too vague to be enforceable.  *Hinc*, 382 F.3d at 721 (holding that a "best efforts" clause is enforceable *if* it is not overly vague); *Wright-Moore Corp.*, 794 F. Supp. at 867 (concluding that the "best efforts" clause in the parties' contract was unenforceable because its requirements were impossible to define). But even assuming that the "best efforts" clause in the parties' Agreement is enforceable, the Agreement also provides that "TGW's calculations with respect to customer status are final and binding."  As such, the plain language of the Agreement gives TGW broad and

sole discretion to track and report customer status and orders.  At most, the "best efforts" clause—if it is enforceable—appears to require TGW to make some good-faith effort to facilitate the self-identification of each customer as either a "New Customer" or a "Return Customer."  *See Bartsh*, 831 F.2d at 1304.

RG has identified no evidence that reasonably suggests that TGW breached its obligation to use "best efforts" to facilitate customer self-identification.  Rather, RG relies on evidence pertaining to TGW's tracking and reporting of repeat customers, phone sales and website traffic, none of which pertains to customer self-identification. Moreover, for the reasons addressed above, there is no evidence from which a jury reasonably could conclude that TGW failed to make any good-faith effort to track and report repeat customers, phone sales, website traffic, or any other aspect of the parties' referral arrangement.  At most, the record reflects that TGW did not clearly understand the scope of its obligations and, in some instances, made mistakes in its tracking and reporting.  Nothing in the record suggests that those mistakes were made in bad faith. Instead, the record reflects that TGW identified and attempted to remedy its mistakes.

For these reasons, the Court rejects RG's contention that TGW breached the Agreement by failing to use reasonable best efforts to identify customers.  Because RG has identified no evidence to demonstrate that TGW breached the Agreement by improperly tracking or reporting customer orders, TGW's motion for summary judgment is granted as to this aspect of RG's breach-of-contract claim.

### b.      Paying Commissions

RG argues that TGW breached the Agreement by failing to pay commissions to RG as required by the Agreement

The Agreement required that "TGW shall pay RG Golf, Inc. for customer orders placed through the RG Golf, Inc. Sales Channels."  To support its contention that TGW did not pay commissions as required, RG relies on the opinions and testimony of TGW's damages expert, Ryan D. Stretmater, who concluded that commissions were not paid correctly.  But RG's reliance on Stretmater's expert opinions is misplaced for at least two reasons.

First, "[a]s a general rule, questions of law are the subject of the court's instructions and not the subject of expert testimony."  *United States v. Klaphake*, 64 F.3d 435, 438 (8th Cir. 1995) (internal quotation marks omitted); *accord S. Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003) ("[E]xpert testimony on legal matters is not admissible.").  "The admission of expert testimony about the requirements of the law 'would give the appearance that the court was shifting to witnesses the responsibility to decide the case.' "  *Portz v. St. Cloud State Univ.*, 297 F. Supp. 3d 929, 952 (D. Minn. 2018) (quoting *Farmland Indus. v. Frazier-Parrott Commodities, Inc.*, 871 F.2d 1402, 1409 (8th Cir. 1989)).  Here, Stretmater has offered an opinion about whether commissions were paid correctly under the Agreement based on

his interpretation of the Agreement's terms.[7]  But construing the terms of the parties'

Agreement is "a pure question of law."  *Cotner*, 919 N.E.2d at 131.  As such, testimony

from TGW's damages expert cannot establish how the terms of the Agreement should be

construed or whether those terms have been breached.

Second, even if Stretmater's expert testimony were relevant to the issue of

whether TGW breached the Agreement, RG mischaracterizes the nature of Stretmater's

testimony.  It is true that Stretmater opined and testified that TGW did not correctly pay

commissions to RG.  Significantly, however, Stretmater opines that TGW *overpaid*

commissions to RG, not that TGW *underpaid* commissions to RG.  Even if Stretmater's

testimony could demonstrate that a breach occurred (which it cannot, as a matter of law),

his testimony suggests both that the purported breach may have been caused by RG's

improper demands for more commissions than RG was entitled to receive *and* that any

such breach benefited RG rather than damaging RG.  For these reasons, Stetmater's

opinions and testimony cannot satisfy RG's burden to prove that TGW breached the

Agreement.

The only other evidence RG identifies that pertains to the alleged underpayment of

commissions is deposition testimony and email evidence reflecting the parties' confusion

and disagreement about the scope of TGW's obligation to pay commissions for "repeat

---

[7]      Indeed, during his deposition, Stretmater testified that he concluded that
commissions were paid incorrectly based on "the assumptions outlined in the report."  As
reflected in Stretmater's report, those assumptions include his interpretation as to when
RG was entitled to commission payments under the Agreement.  And during his
deposition, Stretmater unequivocally testified that he is *not* rendering an opinion about
whether a breach of contract occurred or who is at fault for any breach.

customers." But for the reasons addressed above in Part II.A.1.a. of this Order, RG's theory that TGW underpaid commissions for repeat customers is based on a misconstruction of the Agreement's terms. The plain language of the Agreement did not require TGW to pay commissions for customer orders that were not placed through RG's "Sales Channels." And RG presents no evidence that TGW failed to pay commissions for customer orders that *were* placed through RG's "Sales Channels." Consequently, RG cannot prove that TGW breached the agreement by underpaying commissions to RG.

In summary, RG has identified no evidence from which a jury reasonably could find that TGW breached any material term of the parties' Agreement, which is an essential element of RG's breach-of-contract claim. Because RG cannot prove that a breach occurred, the Court denies RG's motion for summary judgment as to its breach-of-contract claim and grants TGW's motion for summary judgment as to this claim.

### 2.    Damages

Even if RG could establish that TGW breached the Agreement, RG also must prove that RG was damaged as a result of the breach. For the reasons addressed in Part I of this Order, the opinions and testimony of RG's damages expert must be excluded as unreliable. And RG has identified no other evidence to support the damages element of its breach-of-contract claim. As such, the absence of any damages evidence also entitles TGW to summary judgment.

**B.      TGW's Breach-of-Contract Counterclaim**

RG also moves for summary judgment as to TGW's breach-of-contract counterclaim.  TGW opposes RG's motion but does not affirmatively move for summary judgment as to this counterclaim.

As addressed above, the essential elements of a breach-of-contract claim under Indiana law are the existence of a contract, the defendant's breach of the contract, and damages.  *Rogier*, 734 N.E.2d at 614.  Here, RG contends that TGW has not identified what term of the Agreement RG allegedly breached and that TGW has identified no evidence that RG breached the Agreement.  TGW counters that RG breached the Agreement by failing to return overpaid commissions after TGW recalculated the amounts that TGW actually owed to RG.

The Agreement required TGW to pay commissions to RG "for customer orders placed through [RG's] Sales Channels."  The Agreement also provides that "TGW shall provide a periodic report of such numbers to RG Golf, Inc. every month, or as otherwise mutually agreed to" and that "TGW's calculations with respect to customer status are final and binding."

The record reflects that TGW provided monthly reports to RG pertaining to sales and commissions throughout their contractual relationship, as required by the Agreement. Under the express terms of the Agreement, TGW's customer-status calculations in those reports were "final and binding."  Subsequently, in March 2014, TGW notified RG that TGW had *overpaid* commissions to RG.  In a March 20, 2014 email, TGW sent RG an

"updated commission report . . . based on the recompiling of commission data."  The Agreement does not address TGW's authority to *re*-calculate customer status or commission data, however.[8]  Nor does the Agreement address the possibility of a miscalculation or overpayment of commissions, let alone the parties' respective rights and obligations if a miscalculation or overpayment occurs.  The Agreement neither grants TGW the right to re-calculate past commission payments and demand repayment nor requires RG to repay commissions to TGW in response to any such demand. Consequently, TGW has not identified an evidentiary basis to support its allegation that RG breached a material term of the Agreement.

Because TGW has no evidence that RG breached a material term of the Agreement, the Court grants RG's motion for summary judgment as to TGW's breach-of-contract counterclaim.

### C.     TGW's Unjust-Enrichment Counterclaim

RG also moves for summary judgment as to TGW's unjust-enrichment counterclaim.  TGW opposes RG's motion, but TGW does not affirmatively move for summary judgment as to this counterclaim.

---

[8]     Indeed, TGW's monthly customer-status calculations could not be "final," as provided in the Agreement, if those calculations were indefinitely subject to re-calculation at TGW's discretion.

As a threshold matter, the parties do not address whether Minnesota or Indiana law applies to TGW's unjust-enrichment counterclaim.[9] "When deciding choice-of-law issues, the district court sitting in a diversity action generally applies the choice-of-law rules of the forum state." *Glob. Petromarine v. G.T. Sales & Mfg., Inc.*, 577 F.3d 839, 844 (8th Cir. 2009). Under Minnesota law, courts apply the parties' contractual choice-of-law provisions to closely related non-contract claims "if analysis of the claims connected to a contract involves interpretation of the contract." *Holden Farms, Inc. v. Hog Slat, Inc.*, 347 F.3d 1055, 1061 (8th Cir. 2003); *accord Nw. Airlines, Inc. v. Astraea Aviation Servs., Inc.*, 111 F.3d 1386, 1392 (8th Cir. 1997) (concluding that an unjust-enrichment claim was "closely related to the interpretation of the contracts [at issue] and fall[s] within the ambit of the express agreement that the contracts would be governed by Minnesota law").

Here, TGW's unjust-enrichment counterclaim is premised on TGW's allegation that TGW overpaid commissions to RG under the Agreement, which necessarily requires interpreting the Agreement to determine whether TGW paid more commissions than were due. Because TGW's unjust-enrichment counterclaim is closely related to and requires interpretation of the Agreement, the Indiana choice-of-law provision in the

---

[9]     This choice-of-law determination is necessary here because, although unjust-enrichment claims are similar under Minnesota and Indiana law, there are material differences between each state's approach as to some aspects of unjust-enrichment claims. *Compare King v. Terry*, 805 N.E.2d 397, 400 (Ind. Ct. App. 2004) (observing that "[u]nder Indiana's discovery rule, a cause of action accrues . . . when the plaintiff knew or could have discovered an injury") *with Johnson v. Winthrop Labs. Div. of Sterling Drug, Inc.*, 190 N.W.2d 77, 81 (Minn. 1971) (rejecting "discovery rule" for determining when a cause of action accrues).

Agreement also governs TGW's unjust-enrichment counterclaim. *See Nw. Airlines*, 111 F.3d at 1392.

To prevail on an unjust-enrichment claim, a counterclaim-plaintiff "must establish that a measurable benefit has been conferred upon the [counterclaim-defendant] under such circumstances that the [counterclaim-defendant's] retention of the benefit would be unjust." *King v. Terry*, 805 N.E.2d 397, 400 (Ind. Ct. App. 2004). Unjust enrichment "is an equitable doctrine permitting recovery 'where the circumstances are such that under the law of natural and immutable justice there should be recovery as though there has been a promise.' " *Id.* (quoting *Bayh v. Sonnenburg*, 573 N.E.2d 398, 408 (Ind. 1991)).

RG inconsistently asserts that the Agreement does not address refunding overpayments and that TGW cannot prevail on an unjust-enrichment claim because any such claim is governed by the Agreement. Both assertions cannot be true. Generally, "parties cannot recover on the equitable theory of unjust enrichment . . . when a contract controls the rights of the parties." *Aaron MacGregor & Assocs., LLC v. Zhejiang Jinfei Kaida Wheels Co.*, 328 F. Supp. 3d 906, 929 (N.D. Ind. 2018) (citing *Town of New Ross v. Ferretti*, 815 N.E.2d 162, 168 (Ind. Ct. App. 2004)). As addressed above, RG is correct that the Agreement does not require RG to refund alleged overpayments. A contract "must address the 'identical subject' raised in the unjust enrichment claim to preclude liability under the equitable theory." *Id.* (quoting *Engelbrecht v. Prop. Devs., Inc.*, 296 N.E.2d 798, 801 (Ind. Ct. App. 1973)). Here, the Agreement does not address the possibility of a miscalculation or overpayment of commissions, nor does the

Agreement address the parties' contractual rights and obligations if a miscalculation or overpayment occurs.  Because the Agreement does not govern this dispute, the existence of the Agreement does not preclude TGW from seeking recovery through its unjust-enrichment counterclaim.  *See id.*

RG argues, in the alternative, that TGW's unjust-enrichment counterclaim should be limited to exclude any alleged damages barred by the applicable statute of limitations. Under Indiana law, an unjust-enrichment claim is subject to a six-year statute of limitations.  *King*, 805 N.E.2d at 400.  Because TGW first asserted its unjust-enrichment counterclaim on July 24, 2020, any unjust-enrichment claim that accrued before July 24, 2014, is time-barred.  "Under Indiana's discovery rule, a cause of action accrues and the statute of limitations begins to run when the [claimant] knew or could have discovered an injury."  *Id.* (citing *Del Vecchio v. Conseco, Inc.*, 788 N.E.2d 446, 449 (Ind. Ct. App. 2003).  "For a cause of action to accrue, it is not necessary that the full extent of the damage be known or even ascertainable but only that some ascertainable damage has occurred."  *Del Vecchio*, 788 N.E.2d at 449.

Here, TGW's damages expert calculates that TGW erroneously overpaid RG $170,762 in commissions during the parties' contractual relationship.  But most of this relationship—which began on March 10, 2011, and ended on December 10, 2014— occurred outside the six-year limitations period, which commenced on July 24, 2014.  For example, in its March 20, 2014 email to RG, TGW identified $149,029 in allegedly overpaid commissions.  TGW clearly discovered the alleged overpayments that TGW

identified in March 2014 more than six years before TGW asserted its unjust-enrichment counterclaim against RG in July 2020. Damages for these alleged overpayments, therefore, are time-barred. *See King*, 805 N.E.2d at 400.

Accordingly, the Court grants in part RG's motion for summary judgment as to TGW's unjust-enrichment counterclaim. To the extent that TGW seeks damages for allegedly overpaid commissions that TGW knew about or could have discovered before the limitations period commenced on July 24, 2014, TGW's unjust-enrichment counterclaim is time-barred.

## ORDER

Based on the foregoing analysis and all the files, records and proceedings herein,

**IT IS HEREBY ORDERED**:

1.     Defendant The Golf Warehouse, LLC's motion to exclude expert testimony and for summary judgment, (Dkt. 102), is **GRANTED**.

2.     Plaintiff RG Golf Warehouse, Inc.'s motion for summary judgment, (Dkt. 107), is **GRANTED IN PART AND DENIED IN PART** as follows:

  a. RG Golf Warehouse, Inc.'s motion for summary judgment as to The Golf Warehouse, LLC's breach-of-contract counterclaim is **GRANTED**; and

  b. RG Golf Warehouse, Inc.'s motion for summary judgment as to The Golf Warehouse, LLC's unjust-enrichment counterclaim is **GRANTED**

**IN PART AND DENIED IN PART** as addressed in Part II.C. of this

Order.

Dated:  September 2, 2022                          s/Wilhelmina M. Wright
                                                                    Wilhelmina M. Wright
                                                                    United States District Judge